UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TROY ENGELMANN,

                      Plaintiff,

       -against-

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

                    Defendant.
------------------------------------------------------------X
FEUERSTEIN, J.

**FILED**
**CLERK**

3/30/2016 2:43 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**OPINION AND ORDER**
14-CV-5297 (SJF)

       Troy Engelmann ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of the final determination of Carolyn W. Colvin, Acting Commissioner of

the Social Security Administration ("Commissioner"), denying his applications for disability and

supplemental security income benefits.   Before the Court are the Plaintiff's motion for judgment

on the pleadings under Federal Rule of Civil Procedure 12(c) and the Commissioner's cross-

motion for judgment on the pleadings.   For the following reasons, Plaintiff's motion is granted to

the extent it seeks a remand for a new hearing, and the Commissioner's cross-motion is denied.

## I.   BACKGROUND

### A.   Procedural History

       On August 8, 2011, Plaintiff applied for both Social Security Disability and Supplemental

Security Income benefits, alleging a disability onset date of July 20, 2009.   (Transcript of

Administrative Record ("Tr.") (Dkt. 15) at 35-47).   On January 20, 2012, the Social Security

Administration denied Plaintiff's application.   (*Id*. at 77-82).   Plaintiff requested a hearing (*id*. at

86-90), and on December 17, 2012 a hearing was held before Administrative Law Judge April M.

Wexler (the "ALJ"), at which Plaintiff appeared with counsel. (*Id*. at 46-74). On December 21, 2012, the ALJ issued a decision denying Plaintiff's request for benefits upon a finding that Plaintiff was not disabled under Title II of the Social Security Act from July 20, 2009, the alleged onset date, through the date of her decision. (*Id*. at 32-40). On August 6, 2014, the Appeals Council denied the Claimant's request for review (*id*. at 1-6), rendering the ALJ's Decision the final decision of the Commissioner. Plaintiff then commenced this appeal.

### B.     Plaintiff's Personal and Employment History

Plaintiff was born on April 30, 1973. (*Id*. 50). He graduated from college with a four (4)-year degree. (*Id*. at 51). Before the alleged onset date of his disability in July 2009, Plaintiff had been employed since 1997 installing residential security systems, cable television equipment, and, most recently, fences and railings. (*Id*. at 51-53). Plaintiff has not worked since 2009. (*Id*. at 53).

### C.     Medical Evidence

#### 1.     *Pre-July 2009 Medical Records*

Since 2004, Plaintiff's primary care physician has been Dr. Andrew Serpe. (*Id*. at 368). In August 2007, upon Dr. Serpe's referral, Plaintiff had a magnetic resonance imaging ("MRI") scan of his dorsal spine, which revealed mild right lateral disc herniation at D9-D10 and mild posterior disc bulging at D10-D11 and D11-D12. (*Id*. at 261). In October 2007, Dr. Arthur Rosiello, a member of the Neurology Department of Stony Brook University Medical Center, saw Plaintiff, reviewed the August MRI, and diagnosed left thoracic muscle strain unrelated to the right paramedian disc herniation. (*Id*. at 262-63). An MRI of Plaintiff's lumbosacral spine from October 2008 revealed disc bulging, hypertrophic changes of the facet joints, and "mild" spinal stenosis at L2-L3, L3-L4, and L4-L5, but there was no evidence of fracture or bone bruise. (*Id*.

at 264).   Nerve conduction studies and needle electromyography from November 2008 showed evidence of "mild" chronic left L3 and "very mild" right L5 and S1 nerve root irritation, but no evidence of thoracic motor nerve root impingements.   (*Id.* at 265).   On January 24, 2009, Plaintiff saw Dr. Serpe regarding pain in his right ankle.   (*Id.* at 354).   Dr. Serpe appears to have prescribed Plaintiff some pain medication (many of his notes are unreadable), and concluded that Plaintiff needed "another 4-8 weeks to heal."   (*Id.*).

### 2.     *July 2009 – December 2011 Medical Records*

On September 28, 2009, Plaintiff visited Dr. Serpe and reported heel pain and ankle swelling since July.   (*Id.* at 353).   Dr. Serpe noted that an MRI of Plaintiff's ankle had been performed "at that time,"[1]  noted that Plaintiff "currently has no insurance," ordered another MRI, and prescribed pain medication.   (*Id.*).

On January 7, 2010, Plaintiff visited Dr. Serpe and reported "chronic problems" in his right ankle and back pain.   (*Id.* at 352).   Examination revealed "mild swelling."   (*Id.*).   Dr. Serpe ordered another MRI and prescribed pain medication.   (*Id.*).   On January 14, 2010, Plaintiff had an MRI of his right ankle to rule out an Achilles tear and determine if there was a foreign body in his heel.   (*Id.* at 266).   This MRI revealed that the Achilles tendon was diffusely abnormal, which was consistent with diffuse tendinosis, evidence of interstitial tearing, edema within the posterior soft tissues about the calcaneus, and intact plantar fascia.   (*Id.*).   An MRI of Plaintiff's right foot taken the same day revealed "unremarkable" soft tissues, "mild to moderate" osteoarthritis at the first metatarsophalangeal joint, hallux sesamoid complex, and no acute abnormality.   (*Id.* at 267).

---

[1]  The record contains no other evidence of an MRI taken during the summer of 2009.

On January 25, 2010, Plaintiff saw Dr. Serpe, whose notes summarizing that appointment indicate an injury in June 2009 when Plaintiff "stepped on nail," and a "reinjury" in July 2009. (*Id.* at 351). Dr. Serpe reviewed the January 14 MRI scans and prescribed a splint and an appointment with an Achilles tendon specialist. (*Id.*).

On February 24, 2010, Plaintiff went to the emergency department at the Good Samaritan Hospital Medical Center and reported that he had tripped on stairs and injured his right ankle, and also had pain on the side of his left knee. (*Id.* at 232). Plaintiff rated his pain a ten (10) out of ten (10), and stated that zero (0) is an acceptable level of pain. (*Id.*). The notes from this visit indicate that Plaintiff said that the "pain began suddenly today," and that he was "observed to be sitting fine." (*Id.*). Plaintiff reported an "injury in June [2009] to the right Achilles that healed without ever following up." (*Id.*). He walked with a slight limp but was weight-bearing. (*Id.*). Examination revealed normal range of motion in the knees bilaterally, but limited range of motion in the right ankle, tenderness in the left proximal fibula, tenderness in the left lateral knee with small effusion, and a "boggy" feeling over the right posterior ankle. (*Id.*). The attending physician's impression was that Plaintiff had an Achilles tear, and he ordered X-rays of Plaintiff's right ankle and left knee, immobilization of the ankle, and a follow-up appointment with Dr. Brian Mehling. (*Id.* at 234).

Dr. Mehling examined Plaintiff later in the day on February 24, 2010. (*Id.* at 230-31). Plaintiff reported that he was taking Vicodin and Naprosyn. (*Id.* at 230). Examination revealed no motor or sensory deficit, mild tenderness in the right lower extremity, and that Plaintiff could perform dorsal and plantar flexion against resistance. (*Id.*). Dr. Mehling reviewed the X-rays of Plaintiff's right knee and ankle, which were negative for fracture, and the report from the January 2010 MRI of Plaintiff's right ankle, which showed chronic changes in the right Achilles tendon.

(*Id.*).   Dr. Mehling recommended a "cam walker" for two months, physical therapy, and "nonoperative management."   (*Id.* at 231).   If unsuccessful, Dr. Mehling concluded, "we will consider a reconstructive surgery at a later date."   (*Id.*).   Plaintiff was discharged from the Good Samaritan emergency department the same day in stable condition, ambulatory, and with a pain level of zero (0) on a scale of one (1) to ten (10).   (*Id.* at 237).

Plaintiff returned to the Good Samaritan emergency department on March 7, 2010, following another fall in which Plaintiff claimed to have injured his back, neck, and leg, and reported that his pain was a ten (10) out of ten (10) (and again reported that an acceptable level of pain is zero (0)).   (*Id.* at 239).   Examination revealed an antalgic gait, normal range of motion in the back, "mild tenderness" in his mid- to lower-back, and normal spinal curvatures with no deformity.   (*Id.* at 241).   Plaintiff was prescribed Toradol, Robaxin, and Vicodin, and was discharged to his home that same day, reporting that his pain level was zero (0) at the time of discharge.   (*Id.* at 241-43).   The notes of the Good Samaritan attending physician indicate that Plaintiff was to follow up with an orthopedic surgeon in two (2) days (March 9, 2010) (*id.* at 243), but there is no evidence in the record that this appointment actually occurred.

On June 10, 2010, Plaintiff had an appointment with Dr. Serpe and reported chronic Achilles pain and intermittent numbness in his right hand.   (*Id.* at 349).   Dr. Serpe's notes indicate that Plaintiff had lost weight.   (*Id.*).   Dr. Serpe refilled a number of prescriptions and referred Plaintiff to an orthopedist in West Islip (Dr. Douglas Barkin) for consultation regarding Achilles tendon repair and potential back surgery.   (*Id.*).

On August 13, 2010, Plaintiff went to the Nassau University Medical Center emergency department, reporting that he had fallen off a step earlier that day, and twisted his ankle and reinjured his right Achilles tendon.   (*Id.* at 245-47).   Plaintiff reported that his Achilles tendon

had ruptured in December 2009. (*Id.* at 245). Examination revealed that Plaintiff was in "mild" distress, and had swelling, tenderness, and limited range of motion in his right ankle. (*Id.*). Plaintiff's gait was limited by pain. (*Id.*). An X-ray of Plaintiff's right ankle revealed no evidence of acute fracture or dislocation, but did reveal plantar calcaneal spurring, and two calcific densities on the medial and lateral aspect of the distal tuft "of questionable clinical significance." (*Id.* at 247). He was given an ankle splint and discharged home that same day. (*Id.*).

Upon Dr. Serpe's June 10, 2010 referral, Dr. Douglas Barkin, an orthopedic surgeon at Island Orthopedics and Sports Medicine, examined Plaintiff for a right Achilles injury on August 24, 2010. (*Id.* at 268-70). Examination revealed a full range of motion, stable ligaments, and no Achilles tear. (*Id.* at 268). There was some swelling and tenderness along the right Achilles indicative of bursitis / tendinitis. (*Id.*). Dr. Barkin diagnosed right Achilles tendinitis, and recommended that Plaintiff use heel cushions and anti-inflammatory medication, and that he alter his activities. (*Id.* at 270).

On October 19, 2010, Plaintiff returned to Dr. Serpe and reported continuing right Achilles pain, new left Achilles pain, and middle and lower back pain. (*Id.* at 348). Dr. Serpe recommended another MRI and prescribed non-steroidal anti-inflammatory drugs and Percocet. (*Id.*).

Plaintiff did not see Dr. Serpe again until July 21, 2011, at which time Plaintiff reported pain in his middle and lower back, and pain due to Achilles tendinitis. (*Id.* at 347). On August 16, 2011, Plaintiff returned to Dr. Serpe reporting the same conditions, and Dr. Serpe ordered another MRI of Plaintiff's thoracic spine. (*Id.* at 345-46). Dr. Serpe also prescribed Naprosyn, Soma, and Percocet. (*Id.* at 345). On August 18, 2011, Dr. Serpe prescribed physical therapy

(*id.* at 375), which Plaintiff participated in for less than one (1) month, until September 16, 2011. (*Id.* at 372-98). According to a letter from Dr. Serpe, dated December 26, 2012, Dr. Serpe advised Plaintiff to discontinue physical therapy sessions in September 2011 because "the aggressiveness was not beneficial to patient." (*Id.* at 400).

On August 29, 2011, Dr. Serpe filled out a form provided by the New York State Office of Temporary and Disability Assistance (the "OTDA") concerning Plaintiff's relevant medical conditions and ability to engage in employment. (*Id.* at 248-60). Dr. Serpe reported that he had treated Plaintiff since November 2004. (*Id.* at 248). He diagnosed Plaintiff with cervical spine stenosis, thoracic spine disc herniation, lumbar spine stenosis, and a right Achilles tendon tear. (*Id.* at 248). He wrote that Plaintiff's primary symptoms were neck, shoulder, and bilateral knee pain, left-sided thoracic and lumbar pain, ankle pain, and an abnormal gait. (*Id.* at 249). Dr. Serpe opined that these conditions were permanent and that Plaintiff had a poor prognosis for recovery. (*Id.* at 249). He noted that Plaintiff's treatment consisted of physical therapy, epidural steroid injections, nerve blocks, and Naprosyn, Flexeril, Percocet, and Neurontin prescriptions. (*Id.* at 249, 254). Clinical findings consisted of muscle spasms, muscle weakness, abnormal deep tendon reflexes, and positive straight leg raising. (*Id.* at 250). Dr. Serpe cited MRI reports from October 2007 (thoracic spine), October 2008 (lumbar spine), and January 2010 (right ankle and right foot) in support of his opinions. (*Id.*). On a scale of zero (0) to five (5), he graded Plaintiff's motor strength a four (4) in his right and left upper extremities and his right lower extremity, and a three (3) in his left lower extremity. (*Id.* at 251). Dr. Serpe reported that Plaintiff had an abnormal gait, but did not require an assistive device to walk. (*Id.* at 252).

Dr. Serpe reported worsening daily pain that was a seven (7) out of ten (10) in 2004 and a nine (9) out of ten (10) in 2011, and opined that Plaintiff's stated level of pain was consistent with

his physical findings. (*Id.* at 254-56). He described Plaintiff's usual daily activities as "extremely limited … due to chronic progressive pain." (*Id.* at 256). In response to a series of multiple-choice questions concerning the applicant's ability to perform work-related physical activities, Dr. Serpe selected the following options: (i) Plaintiff's ability to lift and carry was "limited" to "frequently (up to 2/3 of the workday)" carrying up to five (5) pounds; (ii) Plaintiff's ability to stand and/or walk was "limited" to up to eight (8) hours per day; (iii) Plaintiff's ability to sit was "limited" to up to eight (8) hours per day; (iv) and Plaintiff's ability to push and/or pull was "limited" in both his upper and lower extremities. (*Id.* at 257). Dr. Serpe also prominently wrote "all day pain" in the middle of these multiple-choice options. (*Id.*).

After a September 27, 2011 appointment, Dr. Serpe noted that Plaintiff had not had MRIs of his thoracic or cervical spine since 2007 and 2008, respectively, that Plaintiff needed a new MRI, and that Plaintiff may need a surgical solution. (*Id.* at 277). On October 6, 2011, Plaintiff had an MRI of his thoracic spine, which showed multilevel degenerative disc changes without significant compression of the spinal cord or exiting nerve roots, disc bulging at T3-4, T4-5, T5-6, T10-11, and T11-12, indentation of the thecal sac at T3-4, T6-7, and T8-9, and disc protrusions at T8-9 and T9-10 (*Id.* at 286-87). An October 19, 2011 MRI of Plaintiff's lumbar spine showed normal lumbar lordosis, normal disc spacing at L1-2, L2-3, L3-4, mild disc bulging at L4-5 and L5-S1, mild canal stenosis, and degenerative changes at T11-12. (*Id.* at 285).

On November 10, 2011, upon Dr. Serpe's referral (*id.* at 276), Plaintiff was evaluated by Dr. Peter Hollis, a neurosurgeon. (*Id.* at 288-89). Dr. Hollis reported that Plaintiff had no spinal tenderness, normal motor function, and that his coordination and gait were intact. (*Id.* at 288). He diagnosed left thoracic radiculopathy and recommended a CT scan (*id*. at 289), which Plaintiff had on November 16, 2011. (*Id.* at 299-300). The CT scan of Plaintiff's thoracic spine showed

multiple small disc bulges, but no evidence of thoracic spinal cord compression.   (*Id.*).   Plaintiff visited Dr. Serpe on December 6, 2011, at which time Dr. Serpe recommended a pain management consultation.   (*Id.* at 275).

### 3.   *2012 Medical Records*

#### a.   Dr. Serpe, Primary Care Physician

Dr. Serpe examined Plaintiff on January 2, 2012 and, on a form entitled "Medical Report for Determination of Disability," diagnosed stenosis in the cervical and thoracic spine, thoracic disc herniation, and Achilles tendinitis.   (*Id.* at 290-98).   Dr. Serpe noted that Plaintiff had decreased abilities to repetitively stoop or bend, remain seated for a long period, crouch, squat, or climb.   (*Id.* at 291).   He noted limitations in Plaintiff's ability to grasp and handle objects, and a decreased ability to tolerate heights, dust, fumes, or extreme temperatures, or to operate machinery.   (*Id.*).   Dr. Serpe cited October 2011 MRIs of the thoracic and lumbar spine in support of his findings.   (*Id.* at 293).   Dr. Serpe also noted that Plaintiff did not require a cane to walk, but used one when his pain was extreme.   (*Id.*).

On February 9, 2012, Dr. Serpe prepared a "Spinal Impairment Questionaire" (*id.* at 334-40), in which he wrote that he had diagnosed Plaintiff with thoracic and lumbar disc disease with spinal stenosis and back pain.   (*Id.* at 334).   He wrote that Plaintiff's prognosis was "poor to fair." (*Id.*).   Clinical findings included reduced thoracic rotation, reduced lumbar flexion and extension, reduced lateral flexion, tenderness in the lumbar and thoracic spine, muscle spasm in the lumbar and thoracic spine, decreased deep tendon reflexes, muscle weakness in the thoracic and lumbar spine, an abnormal gait due to an Achilles tear and tendinitis, swelling of the ankles, crepitus, trigger points in the middle and lower back, and positive straight leg raising at fifteen (15) degrees.   (*Id.* at 334-35).   Dr. Serpe wrote that MRIs of Plaintiff's thoracic and lumbar

spine supported these findings, though did not identify them specifically by date taken or otherwise. (*Id.* at 336). He wrote that Plaintiff's primary symptoms were daily and continuous muscular and neuropathic pain in his middle and lower back, with the pain being greater on the left side. (*Id.*).

In providing his estimate of Plaintiff's RFC, Dr. Serpe indicated that Plaintiff was able to sit for less than one (1) hour per day and stand or walk for less than one (1) hour per day, and, if required to sit, would need to get up and move around more than five (5) times per hour. (*Id.* at 337). Dr. Serpe opined that Plaintiff could occasionally lift up to five (5) pounds, but could never carry any weight. (*Id.* at 337-38). When asked to estimate how often Plaintiff's experience of pain or other symptoms would be severe enough to interfere with attention and concentration, Dr. Serpe selected both "frequently" and "constantly," seemingly indicating that the correct answer lay somewhere between the two. (*Id.* at 338). Dr. Serpe did not believe that Plaintiff is a "malingerer," but did believe that he was incapable of even "low stress" work "due to pain," the effects of medication, and muscle spasms. (*Id.* at 339). He said that Plaintiff's conditions would prevent him both from keeping his neck in a constant position and from engaging in activity on a sustained basis. (*Id.*). Dr. Serpe estimated that Plaintiff's impairments were likely to produce all "bad days," and no "good days." (*Id.*).

Dr. Serpe saw Plaintiff three (3) times between May and August 2012, refilling prescriptions on each occasion, and making no changes in his diagnosis or treatment plan. (*Id.* at 342-44). On December 12, 2012, Dr. Serpe wrote a letter confirming that Plaintiff had been under his care since 2004, had suffered from chronic middle and lower back pain and thoracic and lumbar disc disease with herniation and neuropathy, and had been treated with physical therapy, epidural steroid injections, and acupuncture. (*Id.* at 368). He wrote that Plaintiff's "prescribed

medication also causes fatigue," and that Plaintiff "must avoid prolonged sitting and standing, bending, and twisting." (*Id.*). Plaintiff had an MRI of his right shoulder on December 19, 2012, two (2) days before his administrative hearing, which revealed hypertrophic change of the acromioclavicular joint with calcific tendinitis and a tear of the anterior glenoid labrum. (*Id.* at 399). On December 26, 2012, Dr. Serpe wrote a two (2)-sentence letter indicating that he had advised Plaintiff to discontinue physical therapy in September 2011 "because the aggressiveness was not beneficial to patient." (*Id.* at 400).

b.    Dr. Samir Dutta, OTDA Consultative Examiner

On January 9, 2012, upon the referral of the OTDA, Plaintiff saw Dr. Samir Dutta for an orthopedic examination. (*Id.* at 301-04). Plaintiff reported experiencing pain in his mid-back and right Achilles tendon for the previous fifteen (15) years, noting that he had sustained several injuries. (*Id.* at 301). He had been treated with epidural injections, but said they did not help much. (*Id.*). Plaintiff had not worked since 2009, when he quit his job. (*Id.* at 302). He lived alone and described difficulty cooking and cleaning, but was generally able to care for himself. (*Id.*).

Plaintiff did not appear to be in acute distress, he walked with a limp on the right side and used crutches, he wore a boot on his right foot, and he wore a helmet to prevent head injury in the event of a fall. (*Id.*). Plaintiff could not walk on his heels or toes, and he could only squat one-third (1/3) of the standard distance. (*Id.*). He did not need assistance changing for the examination or getting on and off the examination table. (*Id.*). His hand and finger dexterity was intact. (*Id.*). He had no cervical spine pain or spasm, and no trigger points, but exhibited a limited range of motion. (*Id.*). A straight leg raising test was negative. (*Id.* at 303). Plaintiff had slight spasms and a limited range of motion in the thoracic spine. (*Id.*). He had full strength

11

in his upper and lower extremities. (*Id.*). He had limited range of motion in his right ankle, with tenderness over the heel and Achilles tendon. (*Id.*).

Dr. Dutta diagnosed a post-rupture tendo-Achilles right heel that had healed with fibrosis without repair and a history of herniated disc at T11 and T12 in the process of healing. (*Id.*). Dr. Dutta concluded that Plaintiff had a "[m]ild limitation for sitting and moderate limitation of standing, walking, bending, and marked limitation of carrying weight and going through the stairs." (*Id.* at 303).

### c.    Dr. Marasigan, OTDA Medical Consultant

On January 19, 2012, upon the request of the OTDA, Dr. Marasigan, a medical consultant for whom no first name is provided, submitted a two (2)-page report, the second page of which is blank, containing his/her opinion that Plaintiff could lift or carry ten (10) pounds, could stand or walk for two (2) hours per day, could sit for six (6) hours per day, and could not go up or down stairs. (*Id.* at 311). It is not clear from Dr. Marasigan's report which, if any, of Plaintiff's medical records he/she reviewed in reaching his/her conclusions. Notably, the few dates that are referenced in this brief report do not correspond with the dates of any of the MRI or CT reports contained in the record.

### d.    Dr. Donald Goldman, Examining Orthopedic Surgeon

On December 11, 2012, Dr. Donald Goldman, an orthopedic surgeon, evaluated Plaintiff. (*Id.* at 356-66). Examination revealed loss of the lumbar curve and spasm in the upright position. (*Id.* at 364). Range of motion in Plaintiff's lumbar spine was restricted. (*Id.*). Left knee jerk was absent and right ankle reflexes were absent, there was some atrophy of the right quadriceps and right calf, there was weakness of the right extensor hallucis longis, and positive straight leg test on the right side. (*Id.*). In addition to examining Plaintiff himself, Dr. Goldman reviewed

MRI records, Dr. Serpe's records, and Dr. Hollis' records. (*Id.* at 364-65). He diagnosed thoracic disc herniation at T6-7, T8-9, and T9-10, right lateral recess stenosis, neuroforaminal and central canal stenosis, multiple lumbar disc bulges, lumbar radiculopathy, bilateral neural foraminal stenosis, and lumbar discogenic spondylosis with canal stenosis and facet arthrosis. (*Id.* at 365). Plaintiff's prognosis was "guarded." (*Id.*). Dr. Goldman concluded that Plaintiff is "permanently disabled from any type of employment in view of the fact he has had multiple surgical procedures on his spine, which failed to improve his condition…" (*Id.* at 366).

Dr. Goldman also completed a "Spinal Impairment Questionnaire," in which he diagnosed Plaintiff with herniated discs, and lumbar and cervical stenosis, for which the prognosis was "poor." (*Id.* at 356). Plaintiff displayed a limited range of motion, tenderness and muscle spasm in the lumbar spine, muscle atrophy, and muscle weakness. (*Id.* at 356-57). Plaintiff had an abnormal gait and positive straight leg raising to seventy (70) degrees on the left and sixty (60) degrees on the right. (*Id.* at 357). Dr. Goldman concluded that Plaintiff could sit for three (3) to four (4) hours per day, stand or walk for one (1) to two (2) hours per day, frequently lift and carry up to five (5) pounds, occasionally lift and carry up to ten (10) pounds, and would likely be absent from work more than three (3) times per month due to impairments or treatment. (*Id.* at 359-61).

### 4. *2013 Medical Evidence Submitted to the Appeals Council*

Dr. Serpe wrote a letter, dated July 29, 2013, in which said that Plaintiff's limitations had prevented him from working since 2009. (*Id.* at 403-04). He said that Plaintiff's symptoms had increased significantly since 2009, and that the functional limitations he described in his February 9, 2012 "Spinal Impairment Questionnaire" remained valid. (*Id.*).

On September 16, 2013, Dr. Eric Shapiro evaluated Plaintiff and completed reports that were submitted to the Appeals Council. (*Id.* at 405-16). Dr. Shapiro reviewed Plaintiff's MRIs

from 2007 through 2013. (*Id.* at 406). On examination, Plaintiff had limited range of motion in his neck, shoulders, and lower back, decreased strength in the right extensor hullucis longus, and positive straight leg raising test on the right side. (*Id.* at 406-08). Dr. Shapiro diagnosed right L5-S1 radiculopathy with L4-5 spinal stenosis; right C5-6 radiculopathy with C4-5, C5-6, and C6-7 disc herniations causing spinal stenosis at C4-5 and C5-6; chronic pain syndrome; disc protrusions at T6-7, T8-9, and T9-10; bulging discs at five levels of the thoracic spine and two levels of the lumbosacral spine; sacral torsion with pelvic obliquity; lumbosacral sprain / strain; and cervical sprain / strain (*Id.* at 408). Dr. Shapiro concluded that Plaintiff's prognosis was "poor" and that he was "not a candidate for the workforce in any capacity." (*Id.*). Dr. Shapiro also completed a "Lumbar Spine Impairment Questionnaire" on the same day. (*Id.* at 410-16). He reiterated the same diagnoses and prognosis discussed above, and indicated that Plaintiff could sit for up to two (2) hours per day, stand or walk for up to two (2) hours per day, would need to stand up every thirty (30) minutes if forced to sit, and could occasionally lift or carry up to twenty (20) pounds. (*Id.* at 412-13). He also indicated that Plaintiff would likely experience both "good days" and "bad days," and that Plaintiff's conditions would likely cause him to be absent from work more than three (3) times per month. (*Id.* at 415).

### D.     Non-Medical Evidence

#### 1.     *Plaintiff's Self-Reporting*

In his disability report (Form SSA-3368), Plaintiff identified his impairments as "[b]ack injuries, right torn [A]chilles tendon, and left [ankle] tendonitis." (*Id.* at 175). He reported receiving medical treatment for his back and Achilles tendon from Dr. Serpe beginning in October 2004. (*Id.* at 178). He reported taking the following medications, all prescribed by Dr. Serpe: Ambien, to alleviate insomnia; Naproxen, an anti-inflammatory; Percocet, to alleviate

pain; Vicoden, also to alleviate pain and as an alternative to Percocet; and, Zanaflex, a muscle relaxer.   (*Id.* at 178).

Plaintiff also completed a "Function Report" in connection with his Social Security application.   (*Id.* at 182-93).   He reported that, due to back pain and a tear in his right Achilles tendon, he was no longer able to exercise, run, swim, dance, or have sex.   (*Id.* at 183).   His back pain affected his sleep, keeping him "up all night."   (*Id.*).   He reported that he could no longer tie his shoe laces or take a bath, he felt shaky and unstable in the shower, and he had trouble getting up from the toilet.   (*Id.* at 183-84).   He had no issues grooming his hair, shaving, or feeding himself.   (*Id.*).   He prepared simple meals for himself daily.   (*Id.* at 184).   He was unable to perform most household and yard chores. (*Id.* at 185).   He was able to leave his house alone and went outside five (5) times per week.   (*Id.*).   He was able drive and ride in cars, but reported that his license was suspended.   (*Id.* at 185-86).   He reported shopping for clothes and groceries once or twice a week.   (*Id.* at 186).   He was able to read and watch television, but could no longer exercise or play sports.   (*Id.* at 186-87).   Plaintiff reported that his social activities consisted of talking on the phone and watching television with friends three (3) to four (4) times per week, and attending church every week, but also reported that he had "no social life as a result of [his] injuries."   (*Id.* at 187).

Plaintiff reported that he labored under a variety of physical limitations, but had no limitations with respect to reaching, using his hands, seeing, hearing, or talking.   (*Id.* at 188). He reported that he had no problems paying attention, he was able to finish things that he started, he could follow spoken and written instructions, he did not have any problems getting along with others in the workplace, he was able to handle stress and schedule changes at work, and had no trouble remembering things.   (*Id.* at 189-90).

## 2.    *Plaintiff's Testimony*

Plaintiff testified that, between 1997 and 2009 when he stopped working, he had been employed installing home security systems, installing cable television equipment, and, most recently, installing fences and railings.   (*Id.* at 51-53.)   In 2009, after having worked as a fence and railing installer for five (5) to six (6) years, he stopped working "because it was too painful to do that work…"   (*Id.* at 53).

He had attempted to treat his back and Achilles tendon pain with epidural injections, nerve blockage, Botox, physical therapy, and medication.   (*Id.*).   He had not received epidural injections, nerve blocks, or Botox since he stopped working in July 2009.   (*Id.* at 54-55).   He had received physical therapy both before and after he stopped working.   (*Id.* at 55-56).   He had stopped going to physical therapy approximately a year and a half before the hearing, upon Dr. Serpe's advice that it was "causing more harm than good," and had just resumed physical therapy with a different provider five (5) days before the hearing.   (*Id.* at 55-57).

Plaintiff testified that Dr. Serpe, a general practitioner, is his primary care physician.   (*Id.* at 53-54).   He had seen Dr. Goldman once.   (*Id.* at 54).   He had seen Dr. Santos for nerve blocks, Dr. Bernstein for epidural injections, and Dr. Ford for Botox, but had not seen any of them since before the alleged July 20, 2009 onset date.   (*Id.* at 54-55).   He had been taking Percocet or Vicoden (alternating them monthly), Naproxen, and Zanaflex on a daily basis for the previous five (5) years (since 2007).   (*Id.* at 57).   He also had been taking Xanax "off and on" for the same period, and Adderall "to concentrate" and "read the paper or the news" for an unspecified period.   (*Id.* at 57-58, 65).   Other than his medications and bi-monthly visits to Dr. Serpe, Plaintiff had engaged in no other treatment since 2009.   (*Id.* at 58).

Plaintiff testified that on a typical day he was "pretty much inside the house all day, in bed, on the couch," and that he would try to stretch. (*Id.*). He prepared quick and easy meals for himself. (*Id.*). His mother helped him clean the house, and he sent his laundry out for washing because he was unable to walk down to his basement where his washer and dryer were located. (*Id.* at 59). He left his house three (3) to four (4) times per week to go to his parents' house, which is one (1) mile away from his house, and attended church every Thursday and Sunday. (*Id.* at 59-61). He testified that his mother had been doing his grocery shopping for him for at least three and a half (3.5) years, and either his mother or a friend picked up his medications for him. (*Id.* at 60). He had friends come over to his house to watch sports on television and went out to lunch with friends at restaurants close to his home. (*Id.* at 61). He owned a computer and was able to use it. (*Id.* at 62).

Plaintiff testified that he could not bend at the waist or stoop to pick something off the floor because of pain. (*Id.*). He could walk a block and a half at most, and then had to stop due to back and Achilles pain. (*Id.*). He had balance problems, which caused him to fall down approximately five (5) times a year. (*Id.* at 62-63). He speculated that the falling could be attributable to his the medications he takes, his Achilles tendon, and/or his back. (*Id.* at 63). He had discussed using a cane with his doctor, but had not used one. (*Id.*). He wore an air cast for a year, but his ankle did not heal. (*Id.*). He had done physical therapy for his ankle, but had not had surgery. (*Id.*).

Plaintiff testified that he got migraine headaches at least twice a week, for which he took Vicodin. (*Id.* at 64). He had trouble falling and staying asleep because of pain. (*Id.*). It was difficult for Plaintiff to get out of bed in the morning, sometimes taking more than an hour to complete the process. (*Id.* at 64-65).

He also testified that he had trouble concentrating due to his pain and his various medications.   (*Id.* at 63).   It was difficult for him to read books.   (*Id.*).   He took Adderall, which helped him focus, but "if the pain overrides" the Adderall, he could not read, watch television, or socialize with friends.   (*Id.*).    He estimated that the pain was so bad that, even with the aid of Adderall, he was unable to sustain the focus necessary to read, watch television, or socialize (4) days a week.   (*Id.*).

Plaintiff testified that he had mild arthritis and constant tingling in his hands.   (*Id.* at 66). The tingling negatively impacted his ability to pick things up, write, or operate a zipper, for example.   (*Id.*).   He could lift ten (10) pounds; anything more than that would be difficult and would put him at risk.   (*Id.* at 67).   He had not received any treatment for the tingling in his hands.   (*Id.*).

### 3.    *Vocational Expert Testimony*

Victor Alberigi, a vocational expert, also answered the ALJ's questions regarding Plaintiff's potential employment prospects.   (*Id.* at 68-73).   Mr. Alberigi testified that a hypothetical person of like age, education, and work history who is limited to sedentary work, and who can occasionally lift ten (10) pounds, sit for approximately six (6) hours, and stand or walk for approximately two (2) hours during an eight (8)-hour work day with normal breaks, could not perform any Plaintiff's three (3) previous jobs installing home security systems, cable television equipment, and fences.   (*Id.* at 70).

However, Mr. Alberigi testified that there were other jobs that exist in the national and local economy that such a hypothetical person could perform.   (*Id.* at 70-72).   He offered the following three (3) examples: (i) a document preparer (Dictionary of Occupational Titles ("DOT") No. 239.587-018), which is classified as a sedentary, unskilled job, and of which there

were more than two million, one hundred thousand (2,100,000) positions nationally, and thirty-one thousand (31,000) locally (*id.* at 71); (ii) an addresser (DOT No. 209.587-010), which is classified as a sedentary, unskilled job, and of which there were one hundred thirty-eight thousand (138,000) positions nationally, and more than four thousand (4,000) locally (*id.*); and (iii) a charge account clerk (DOT No. 205.367-014), which is classified as a sedentary, unskilled job, and of which there were more than two hundred forty-eight thousand (248,000) positions nationally and three thousand, five hundred (3,500) locally (*id.* at 71-72).

Finally, Mr. Alberigi testified that if the hypothetical person described above were also limited to performing simple, routine tasks involving no more than one (1) or two (2)-step instructions, with simple work-related decisions and few workplace changes, he would still be able to perform these jobs. (*Id.*). However, if this hypothetical person would also need to be absent from work three (3) to four (4) times per month, he would not be able to perform these jobs because, as a new hire, he would not have accumulated enough sick time to miss this much work. (*Id.*).

### E.     The ALJ's Decision

The ALJ employed the five (5)-step sequential analysis set forth in 20 C.F.R. § 404.1520, found that Plaintiff was "not disabled" within the meaning of the Social Security Act, and denied his request for disability benefits. (*Id.* at 32-40). She found that Plaintiff met the insured status requirements, had not engaged in substantial gainful activity since the alleged onset date, and suffered from back impairment, right torn Achilles tendon, left ankle tendonitis, and issues with concentration, which were severe impairments. (*Id.* at 34). The ALJ did not credit Plaintiff's complaints regarding numbness in his hands because they were not supported by the medical record, and concluded that "the alleged numbness in his hands imposes no more than minimal

limitations on his ability to perform the basic demands of work activity and is not a severe, medically determinable impairment." (*Id.* at 34-35). She found that none of Plaintiff's impairments met the severity of a Listing. (*Id.* at 35).

Next, the ALJ found that Plaintiff had the RFC to perform a wide range of sedentary work, because he could: occasionally lift ten (10) pounds; sit for approximately six (6) hours and stand or walk for approximately two (2) hours, with normal breaks, in an eight (8)-hour workday; and push and pull without limitation. (*Id.*). The ALJ determined that Plaintiff could never climb ramps, stairs, ladders, ropes, or scaffolds, and could not balance, stoop, kneel, crouch or crawl. (*Id.*). She also found that Plaintiff was limited to occupations that entail only simple routine tasks involving no more than simple, one (1) or two (2)-step instructions, and simple work-related decisions with few workplace changes. (*Id.*).

In reaching this RFC determination, the ALJ found that Plaintiff's statements at the hearing regarding the intensity, persistence, and limiting effects of his symptoms were not supported by the medical record (*id.* at 36-37), and were belied by the lack of rigorous treatment efforts (*id.* at 36) and his prior statements that he "can dress, bathe, and groom himself, [and] prepare simple meals, drive an automobile, and attend church regularly … [and] has no problems paying attention, finishing what he starts, and following oral and written instructions." (*Id.* at 37).

The ALJ assigned "significant weight" to the opinions of Drs. Dutta (the OTDA consultative examiner) and Marasigan (the OTDA medical consultant), as their opinions "are supported by and consistent with diagnostic imaging and testing as well as clinical findings set forth in Exhibits 1F [*id.* at 229-43], 3F [*id.* at 248-70], 5F [*id.* at 273-300], and 6F [*id.* at 301-04]." (*Id.* at 38). She assigned "little weight" to the opinions of Drs. Serpe (Plaintiff's primary

care physician since 2004) and Goldman (the examining orthopedic surgeon) concerning Plaintiff's functional limitations, as their opinions "are inconsistent with diagnostic imaging and testing in Exhibits 2F, 3F, and 5F and the opinions of Drs. Dutta and Marasigan." (*Id.*). The ALJ also noted that Dr. Serpe's findings regarding Plaintiff's "limitations set forth in Exhibits 12F [*id.* at 333-40] and 16F [*id.* at 367-68] are inconsistent with Dr. Serpe's own findings in a medical source statement dated August 29, 2011 [*id.* at 248-70], which indicated that the [Plaintiff] could stand, walk, and sit up to 8 hours in an 8-hour day." (*Id.*).

At step four (4), the ALJ found that Plaintiff could not perform his previous work installing home security systems, cable television equipment, or fences. (*Id.* at 39). At step five (5), upon consideration of Mr. Alberigi's (the vocational expert) testimony, and Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," at that Plaintiff therefore was "not disabled." (*Id.* at 39-40).

## II.      DISCUSSION

### A.      Standards of Review

#### 1.      *Rule 12(c)*

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to a Rule 12(c) motion is the same as that applied to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). To survive such a motion, "a complaint must contain sufficient factual matter. . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009) (internal quotations omitted).

The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Id.* at 679. The court is limited "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

### 2. *Review of Determinations by the Commissioner of Social Security*

A court reviewing the final decision of the Commissioner may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court must consider whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009)). "[I]t is not the function of the reviewing court to decide *de novo* whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotations and citations omitted). "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id*. (internal quotations and citations omitted).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's conclusions of law or application of legal standards. *See Byam v. Barnhart*, 336 F.3d 172, 179

(2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Rather, courts have a statutory and constitutional duty to ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence. *See Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004). If a court finds that the Commissioner has failed to apply the correct legal standards, the court must determine whether the "error of law *might* have affected the disposition of the case." *Id.* at 189 (emphasis added). If so, the Commissioner's decision must be reversed. *Id.*; *see also Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the application of the correct legal standard could lead only to the same conclusion, the error is considered harmless and remand is unnecessary. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

"Upon setting aside the Commissioner's decision, the court may either remand for a new hearing or remand for the limited purpose of calculating benefits." *Maline v. Astrue*, No. 08-civ-1712, 2010 WL 4258259, at *2 (E.D.N.Y. Oct. 21, 2010) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987). "Remand for the calculation of benefits is appropriate when the record provides persuasive proof of disability and the application of the correct legal standards 'could lead to only one conclusion.'" *Id.* However, "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard," the court should remand "for further development of the evidence." *Rosa v. Callahan,* 168 F.3d 72, 82-83 (2d Cir. 1999). Where "further administrative proceedings would serve no purpose, remand for the calculation of benefits is warranted." *Sublette v. Astrue*, 856 F. Supp. 2d 614, 619 (W.D.N.Y. 2012).

**B.      Evaluation of Disability**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The regulations promulgated under the Social Security Act require the Commissioner to apply a five (5)-step sequential analysis to determine whether an individual is disabled under Title II of the Social Security Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i) and (b). "Substantial work activity … involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity … is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). If a claimant is doing "substantial gainful activity," the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) and (b). If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Social Security Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d). If the Commissioner does not determine that the claimant is disabled at the third step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [("RFC")] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). The RFC is "the most [the claimant] can still do despite [his or her] limitations." *Id*.

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can adjust to other work, the claimant is not disabled. *Id*. If the claimant cannot adjust to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving the first four (4) steps of the sequential analysis, and the burden shifts to the Commissioner at the final step. *See Talavera*, 697 F.3d at 151.

## C. Application of the Five-Step Sequential Analysis

Plaintiff argues that: (i) the ALJ erred by unreasonably rejecting the opinions of Drs. Serpe (Plaintiff's treating physician) and Goldman (the examining orthopedic surgeon) in favor of the opinions of Drs. Dutta (the OTDA consultative examiner) and Marasigan (the OTDA medical consultant) (*see* Pl's Br. (Dkt. 12) at 12-19); (ii) the ALJ failed to properly evaluate Plaintiff's credibility (*see id.* at 19-22); and (iii) remand is warranted based on new evidence Plaintiff submitted to the Appeals Council (*see id.* at 22-24). The Commissioner argues the opposite with respect to each of these points. (*See* Def's Br. (Dkt. 14) at 17-24).

### 1. *Treating Physician Rule*

Plaintiff argues that the ALJ violated the "treating physician rule," under which "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given

'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)). "In order to override the opinion of the treating physician, . . . the ALJ must *explicitly* consider, *inter alia*: (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129) (emphasis added).

In rejecting the opinions of Drs. Serpe and Goldman, the ALJ either failed to address these issues entirely, or did not address them sufficiently. Nowhere in her decision did she address (i) the frequency, length, nature, and extent of Dr. Serpe's treatment; (ii) medical evidence supporting Dr. Serpe's (and Dr. Goldman's) opinion concerning Plaintiff's functional limitations; or (iii) which doctors are or are not specialists.[2] (*See* Tr. at 32-40, *passim*). And while she did evaluate the consistency of Drs. Serpe's and Goldman's opinions regarding Plaintiff's functional limitations with the other medical evidence, she glossed over certain deficiencies and inconsistencies in the purportedly contradictory evidence, and improperly elevated her own interpretations of various diagnostic reports above those of medical doctors.

First, in disregarding the opinions of Drs. Serpe and Goldman, the ALJ accorded "significant weight … to the opinions of Drs. Dutta and Marasigan, as they are supported by and

---

[2] While the ALJ did note that Dr. Peter Hollis was an "examining neurosurgeon" (Tr. at 37) she referred to Dr. Dutta as a "consultative examiner" (*id.*), Dr. Marasigan as a "[s]tate agency medical consultant" (*id.*), Dr. Serpe as a "treating physician" (*id.* at 38), and Dr. Goldman as an "examining physician" (*id.*), without noting the specialties, if any, of the latter four (4) doctors. This is particularly troublesome given Plaintiff's contention that, notwithstanding the fact that his sole report is entitled "orthopedic examination," Dr. Dutta is a non-specialist, general surgeon. (*See* Pl's Br. At 7, n. 17). The signature line at the end of Dr. Dutta's report also identifies him as a "General Surgeon." (Tr. at 304).

consistent with diagnostic imaging and testing as well as clinical findings…" (Tr. at 38). It appears that Dr. Dutta is a general surgeon (not a specialist), and he saw Plaintiff only once, on January 9, 2012. (*See id.* at 301-04). "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F. 3d at 419 (citing *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)). As to Plaintiff's medical records, Dr. Dutta's report references only one (1) MRI of the lumbar spine "done 11/11" and one (1) X-ray of the right Achilles taken "five years ago," contains no independent analysis of those records, and contains no reference at all to any of Plaintiff's other diagnostic records that the ALJ references in her decision. (*See* Tr. at 301-04). If Dr. Dutta saw Plaintiff only once and did not analyze the results of Plaintiff's various diagnostic tests, as the record indicates, his opinion should not be accorded "substantial evidence" status. *See Burgess v. Astrue*, 537 F.3d 117, 132 (2d Cir. 2008) (opinion of consultative examiner who did not review relevant MRI reports not substantial evidence).

As to Dr. Marasigan, the OTDA non-examining "medical consultant," it is not clear what the ALJ saw in his/her one (1)-page report that she found persuasive, as it consists of little more than conclusions regarding Plaintiff's RFC and seemingly makes no reference to any of the diagnostic records that the ALJ references in her decision. (*See* Tr. at 311-12). "The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant." *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990) (quotations omitted). A medical adviser's job is "to explain complex medical problems in terms understandable to lay examiners." *Id.* Dr. Marasigan's meagre report falls far short of that standard.

Second, in according "little weight" to Dr. Serpe's February and December 2012 opinions concerning Plaintiff's functional limitations (*see* Tr. at 334-40, 368), the ALJ "note[d] that the limitations set forth in Exhibits 12F [*id.* at 333-40] and 16F [*id.* at 367-68] are inconsistent with Dr. Serpe's own findings in a medical source statement dated August 29, 2011 [*id.* at 248-70], which indicated that the [Plaintiff] could stand, walk, and sit up to 8 hours in an 8-hour day."   As discussed above (*supra* at 8), this information is gleaned from an OTDA form questionnaire on which Dr. Serpe checked various boxes and wrote "all day pain" prominently in the middle of the questionnaire (Tr. at 257) -- a point that the ALJ neglected to mention.   This notation raises serious questions regarding the message that Dr. Serpe intended to convey in checking the boxes that he did.   By checking the "Limited" and "up to 8 hours per day" boxes under "Stand and/or walk," it is unclear whather Dr. Serpe meant that Plaintiff could continuously stand and/or walk for eight (8) hours per day, or that he would endure limitations in his ability to stand and/or walk throughout the entirety of an eight (8)-hour workday.   If he intended the former, this would seem to directly contradict other portions of the same report – for example, that Plaintiff's usual daily activities were "extremely limited … due to chronic progressive pain," and that Dr. Serpe's physical findings were consistent with Plaintiff's level of pain.   (*Id.* at 256).   The ALJ's selective reading of Dr. Serpe's August 29, 2011 report and failure to reconcile the inconsistencies within it warrants remand for further development of the record.   *See Selian*, 708 F. 3d at 418-19 (remanding case for further development of the record where ALJ "made no effort to reconcile ... apparent inconsistency" in treating physician's notes).

Finally, in light of the fact that there is no evidence that Drs. Dutta or Marasigan reviewed any of the relevant diagnostic reports, and certainly did not provide any meaningful opinions regarding their import, the ALJ improperly substituted her own judgment concerning the meaning

of various diagnostic tests without any explanation. For example, she noted that an October 6, 2011 MRI of Plaintiff's thoracic spine "revealed *only* multilevel degenerative disc change…," and a November 16, 2011 CT scan of his thoracic spine "presented *only* moderate disc space narrowing with associated endplate degenerative changes … [and] a small … disc bulge with *only* mild canal stenosis." (Tr. at 36) (emphasis added). There are no logical bridges between these basic descriptions of diagnostic reports (made by a non-doctor) and the ALJ's conclusion that Drs. Serpe's and Goldman's opinions concerning Plaintiff's functional limitations are entitled to "little weight." An ALJ "cannot arbitrarily substitute [her] own judgment for competent medical opinion." *Balsamo v. Chater*, 142 F. 3d 75, 81 (2d Cir. 1998).

In sum, the ALJ unreasonably departed from the "treating physician rule" by (i) crediting Drs. Dutta's and Marasigan's opinions regarding Plaintiff's RFP, neither of which ostensibly qualify for "substantial evidence" treatment, over Drs. Serpe's and Goldman's; (ii) failing to address the portions of Dr. Serpe's August 29, 2011 report that are inconsistent with the notion that Plaintiff "could stand, walk, and sit up to 8 hours in an 8-hour day"; and (iii) elevating her own opinion regarding the import of various diagnostic reports above Dr. Serpe's opinion without any medical or logical support.[3]

---

[3] Because the Court is remanding this action for another hearing and further development of the record in accordance with the "treating physician rule," it is unnecessary to address Plaintiff's argument that the ALJ failed to properly evaluate Plaintiff's credibility, as the ALJ will need to re-evaluate his credibility in light of the properly developed medical evidence. *See, e.g.*, *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) (ALJ retains discretion "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant"). Likewise, it is unnecessary to address Plaintiff's argument that Dr. Serpe's July 29, 2013 letter (Tr. at 403-04) and Dr. Shapiro's September 16, 2013 letter and "Lumbar Spine Impairment Questionnaire" (*id.* at 405-16), both of which Plaintiff submitted to the Appeals Council, warrant remand. Of course, the ALJ is free to consider these items on remand to the extent they relate to the alleged period of disability.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure is granted to the extent it seeks a remand for a

new hearing, and the Commissioner's cross-motion is denied.


**SO ORDERED.**


*s/ Sandra J. Feuerstein*
Sandra J. Feuerstein
United States District Judge

Dated:   March 30, 2016
         Central Islip, New York